1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    KENLEY EMERGENCY MEDICINE, et          Case No.  20-cv-03274-SI
     al.,
8
              Plaintiffs,                    **ORDER RE: MOTION TO DISMISS**
9
          v.                                 Re: Dkt. No. 74
10
11   THE SCHUMACHER GROUP OF
     LOUISIANA INC., et al.,
12
              Defendants.
13

14        The two defendants, a national medical management company and its California-based

15   affiliate, filed a motion to dismiss a qui tam relator's third amended complaint, which alleges

16   fraudulent billing practices.  Dkt. No. 74.  The Court held a hearing on defendants' motion on April

17   18, 2025.  For the reasons stated below, the Court DISMISSES with prejudice non-California state

18   law claims against California-based defendant California Emergency Associates, but DENIES the

19   motion in all other respects.

20

21                                 **BACKGROUND**

22   **I.    Factual Background**

23        Dr. Eric Kenley is the sole owner of qui tam plaintiff and relator, Kenley Emergency

24   Medicine Corporation.  Dkt. No. 24[1] (Third Amended Complaint ("TAC")) ¶ 16.  Dr. Kenley is an

25

26   _____

27        [1] A redacted public version of the third amended complaint is at Docket Number 98.  For
     purposes of resolving this motion, the Court assumes that the plaintiff's allegations are true and
     draws all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d
28   556, 561 (9th Cir. 1987).

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

attending emergency physician and was the medical director at Chinese Hospital in San Francisco, California. *Id.* ¶ 17. Dr. Kenley's corporation contracted with defendant California Emergency Associates, an affiliate of defendant The Schumacher Group of Louisiana, Inc. (d/b/a SCP Health), to provide emergency medical services at the hospital.[2] *Id.* It is now common for hospitals to outsource the management of emergency departments and defendant SCP Health staffs 400 hospital facilities around the country. *Id.* ¶¶ 4-5, 20. Through Medicare, Medicaid, and other state programs, the federal and state governments fund the majority of services at emergency departments. *Id.* ¶ 3.

The third amended complaint gives basic information about the provision of emergency medical care and related billing practices. The amount that providers receive from the government or private insurers depends on the codes used to describe the care provided. *Id.* ¶ 44. There are five levels of non-critical care evaluation and management services, each with a separate code. *Id.* ¶¶ 47-49. Level 5 reflects the highest intensity of services (and warrants the highest reimbursement) and Level 1 the lowest. *Id.* There are also two critical care codes and, to bill for critical care, Medicare guidance requires both that the patient be critically ill or injured and that the physician provide critical care treatment, and also that the length of the service provision (in minutes) be documented. *Id.* ¶¶ 50-52. Federal law prohibits government reimbursement for services that are not reasonable or necessary. *Id.* ¶ 46 (citing 42 U.S.C. § 1395y(a)(1)(A)). Most of SCP Health's contracted physicians (although not relator) are paid based on productivity, with higher levels of care resulting in higher payments. *Id.* ¶¶ 63-64. According to relator, physicians "reasonably rely" on management groups like defendants to ensure care is billed at the appropriate level. *Id.* ¶¶ 65-67. For their part, the federal government and private insurers deny claims when they are aware of improper coding. *Id.* ¶ 204.

Relator alleges that defendants SCP Health and its affiliates instituted two systematic fraudulent practices in their coding and billing of emergency medical services. *Id.* ¶ 72.

---

[2] Relator alleges that SCP Health operates through a network of subsidiaries and affiliates but these companies "function as a single unified entity with SCP setting the policies, providing the training for staff, and providing all of the administrative services, including all coding and billing services at issue" in this case. TAC ¶¶ 21-22.

First, defendants improperly pressured providers into charting for critical care services when the threshold for such services had not been met.  SCP Health trained its coders, who work out of SCP Health's corporate headquarters, to look in patient charts for opportunities to bill services as critical care, even if the providers had not initially coded their services as critical care.  *Id.* ¶¶ 74-75, 188.  The coders then "routinely bombard physicians with leading queries and misleading information" contained in "chart deficiency notices" that label their original charts as "deficient" or "incomplete."  *Id.* ¶¶ 75-77, 90-94, 107-113.  SCP Health "threatens punishment to pressure quick responses."  *Id.* ¶¶ 75-77.  When combined with "misleading guidance on what constitutes critical care," including "vague and overbroad descriptions of what constitutes critical illness and critical care treatment," these deficiency notices result in the submission of bills for critical care where such care was not provided because "physicians naturally assume the SCP coder is correct."  *Id.* ¶¶ 76-78, 94-102.  Moreover, since the deficiency notices often come days or weeks after the treatment is provided, the physician's memory of the treatment is less solid and the physician is more likely to alter the charts as directed.  *Id.* ¶¶ 104-106.  And once pushed to code certain forms of treatment as critical care, physicians began to code future similar cases the same way, based on the improper guidance and pressure they had previously received.  *Id.* ¶¶ 172-173.  Notably, relator alleges the centralized coding team never asked physicians to downgrade the level of care coded, only to upgrade it to higher, more profitable levels.  *Id.* ¶¶ 114, 173.

Second, relator alleges that SCP Health deliberately and inappropriately "upcodes" non-critical care to a higher, more profitable level of non-critical care.  *Id.* ¶ 184.  Since non-critical care coding does not require a physician statement, SCP Health's coders make these changes on their own.  *Id.* ¶ 185.

Relator's own investigation of critical care "upcoding" practices at its hospital found in an audit sample that 30% of charts upgraded to a critical care code after a deficiency notice did not contain a necessary critical care statement from the physician, which SCP Health "knows, deliberately ignores, or recklessly disregards."  *Id.* ¶¶ 116-117.  Relator identifies four common conditions improperly upgraded to critical care: "sepsis, troponin elevations or possible NSTEMI [a form of heart attack], anemia, and possible stroke."  *Id.* ¶ 118.  Relator details representative

examples of inappropriate billing for twenty-seven patients with these conditions. *Id.* ¶¶ 119-183.

Relator also audited twenty random charts from five days in November 2019 coded at the highest level of non-critical care (Level 5) and determined "conservatively" that nine of the twenty should have been billed at either Level 4 or Level 3. *Id.* ¶ 187. In the TAC, relator also provides five representative examples of patients whose care was inappropriately billed at Level 5. *Id.* ¶¶ 189-199.

While relator's experience is limited to one California hospital, relator alleges the practices at issue were employed by SCP Health nationwide. SCP Health operates through a "highly centralized management structure." *Id.* ¶¶ 59-62. The complaint alleges that SCP Health controls the contracts between its subsidiaries and providers. *Id.* ¶¶ 57-58. SCP Health supervises its contract physicians, sets compensation, and controls the coding and billing related to patient care. *Id.* ¶ 56. SCP Health trains newly contracted physicians how to respond to "chart deficiency" notices. *Id.* ¶¶ 68-69. Dr. Kenley was informed during his training that sending deficiency notices was a standard practice at all of SCP Health's sites, and "[m]ultiple SCP employees and executives" have reiterated the company's practices are standardized nationwide. *Id.* ¶¶ 79-82. SCP Health wants each provider to be billing critical care at least 20% of the time and labels those not meeting the target "outliers." *Id.* ¶ 70. Since SCP Health's coders follow a standardized process, relator alleges its experience at its hospital "is likely representative of other SCP sites." *Id.* ¶ 188.

The patient examples provided by relator refer to care provided in 2019 and 2020, when relator began contracting with SCP Health. *Id.* ¶ 7. But relator alleges the upcoding has taken place "[f]or at least several years before Relator began working at Chinese Hospital, and possibly since 2010," when SCP Health began using its proprietary billing and coding platform. *Id.* ¶ 73. After Dr. Kenley continued to raise concerns about the upcoding, SCP Health made changes in late 2020 "that obscured the more conspicuous aspects of the fraud," but relator alleges upcoding remains ongoing. *Id.* ¶ 88.

Relator's complaint alleges twenty-two causes of action, under the federal False Claims Act (Count I), the California false claims act (Count II), California and Illinois insurance fraud prevention laws (Counts III and VIII), and the false claims acts of seventeen other states (Counts

IV-VII, IX-XXII): Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Nevada, New Mexico (two different counts), New York, North Carolina, Oklahoma, Tennessee, Texas, Virginia, and Washington. *Id.* ¶¶ 208-377. Relator seeks injunctive relief that forces defendants to cease and desist from the alleged fraudulent practices, maximum statutory damages, and attorney's fees. *Id.* at 83-85.

## II.    Procedural History

Relator initially filed its qui tam complaint under seal against defendants on May 14, 2020. Dkt. No. 1. On July 16, 2020, Magistrate Judge Spero granted the government's request for a six-month extension of time to decide whether to intervene. Dkt. No. 10. Judge Spero subsequently granted a series of additional six-month extensions for the following three years. Dkt. Nos. 17, 27, 30, 32, 34, 36. During this period, relator amended the complaint several times, and the now-operative third amended complaint expanded to include claims under the false claims acts of myriad states. Dkt. Nos. 13, 16, 24. On January 31, 2024, Judge Spero extended the intervention deadline to April 5, 2024. Dkt. No. 38.

On April 5, 2024, the United States and the various plaintiff states declined intervention in the litigation. Dkt. No. 39. The California Insurance Commissioner declined intervention on April 11, 2024. Dkt. No. 42. Judge Spero unsealed the case and set an initial case management conference for April 19, 2024, then postponed the conference upon relator's ex parte request since defendants had yet to be served. Dkt. Nos. 40, 41, 43, 44. The case management conference was ordered postponed a second time on July 11, 2024, then the case was transferred to the Court of the undersigned judge on July 26, 2024. Dkt. Nos. 49, 56. The Court granted defendants multiple extensions to respond to the operative complaint. Dkt. Nos. 61, 67, 73. Defendants then filed the present motion to dismiss the third amended complaint on December 13, 2024 and set an unusually elongated briefing schedule. Dkt. No. 74 ("Mot."). Relator filed an opposition on February 11, 2025, and defendants filed their reply on March 13, 2025. Dkt. Nos. 92 ("Opp'n"), 97 ("Reply").

United States District Court
Northern District of California

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation and internal quotation marks omitted).

Under Rule 9(b), fraud claims must be pled with particularity. Fed. R. Civ. P. 9(b). Rule 9(b)'s heightened pleading requirements demand that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged" and "must set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citations omitted). Specifically, fraud allegations must include the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir.2004)). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Rule 9(b) serves two purposes: to give adequate notice to defendants and to deter the filing of "false or unsubstantiated charges" with the hope of proceeding to discovery. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). In the context of the False Claims Act,

6

> mere conclusory allegations of fraud are insufficient. Broad allegations that include no particularized supporting detail do not suffice but statements of the time, place and nature of the alleged fraudulent activities are sufficient. Because this standard does not require absolute particularity or a recital of the evidence, a complaint need not allege a precise time frame, describe in detail a single specific transaction or identify the precise method used to carry out the fraud. The complaint also need not identify representative examples of false claims to support every allegation. It is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.

*Id.* (citations, internal quotation marks, brackets, and footnote omitted).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

### I.    Relator's Ability to Pursue this Action

Defendants first argue that qui tam actions violate the appointments clause under Article II of the U.S. Constitution.[3] Mot. at 4-7. To the extent the argument is a facial attack on the qui tam statute, the argument fails. Defendants acknowledge that the Ninth Circuit rejected this same argument in *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993). *Kelly* remains good law in this circuit and nothing in the Supreme Court's majority holding in *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023) suggests otherwise. The opinion of the district court in *United States ex rel. Zafirov v. Florida Medical Associates, LLC*, No. 8:19-CV-01236-KKM-SPF, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024) cited by defendants is not persuasive. "The Court is bound by [] Circuit precedent, not a district-court opinion, or even a dissent or concurrence by a Supreme Court justice." *See United States v. Chattanooga Hamilton*

---

[3] Defendants frame this argument as a challenge to the Court's jurisdiction to consider this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure. However, the Ninth Circuit has held that "Article II problems" do not implicate Article III jurisdiction. *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1190 (9th Cir. 2016).

United States District Court
Northern District of California

*Cnty. Hosp. Auth.*, No. 1:21-CV-84, 2024 WL 4784372, at *2 (E.D. Tenn. Nov. 7, 2024) (rejecting *Zafirov*).[4]

Defendants next challenge relator's standing on two other grounds.  First, defendants contend that relators have no standing to seek injunctive relief. Mot. at 7; Reply at 2-4.  At oral argument, relator clarified that it was only pursuing injunctive relief to the extent such relief is available under the False Claims Act.  Neither relator nor defendants provide any legal authority regarding whether relators may pursue injunctive relief under the False Claims Act in the case of government non-intervention.  In fact, both sides criticize the other on their inability to cite relevant law in support of their positions on this issue.  Opp'n at 10; Reply at 4.  To be fair, the case law on whether the False Claims Act allows for injunctive relief is meager.  *See United States ex rel. L. Project for Psychiatric Rts. v. Matsutani*, No. 3:09-CV-0080-TMB, 2010 WL 11526903, at *12 n.144 (D. Alaska Sept. 24, 2010) (stating that injunctive relief "may not even be available under the FCA" and citing several cases offering indirect support for that proposition).  The Court notes that the statute allows for civil penalties, including treble damages, but makes no mention of injunctive relief.  *See* 31 U.S.C. § 3729(a)(1).  While the Court is not convinced this is a question of standing particular to a relator, the Court holds that injunctive relief is not the proper remedy under the False Claims Act.  Should relator ultimately prove violations under the Act, the Court believes treble damages would be sufficient to deter future similar violations.

Second, defendants offer a "factual attack" to relator's standing where, as defendants assert, the defendants voluntarily refunded the government before learning about the filed qui tam action. Mot. at 6-7; Reply at 1-4.  Defendants provide a declaration from a senior vice president from an affiliated company asserting that "Schumacher affiliates" ultimately provided $154,522.49 in refunds to the government after an audit of "Medicare billing issues." Dkt. No. 74-1.  Since the government accepted this refund and chose not to intervene in relator's action, defendants conclude

---

[4] Relator argues that defendants have forfeited any challenges to the constitutionality of the qui tam statute because defendants did not provide a notice to the government in violation of federal and local rules. Opp'n at 8-9.  Defendants subsequently provided this notice. *See* Dkt. No. 97-1. The Court's holding on this issue rests on substantive grounds, not any procedural defects.

that the government has no rights to "assign" to the relator under the qui tam statutory framework. Reply at 2. However, the Court is not convinced that defendants' proactive refund negates relator's standing. As a factual matter, the Court has no way to evaluate whether defendants' refund relates to relator's claims, or whether it fully satisfies the extent of the alleged fraud against the government. Defendants put forward no evidence that the government accepted the refund in exchange for releasing defendants from any other liability. To the contrary, defendants highlight how most of the refund was provided proactively. While the Court certainly does not want to discourage or disincentivize proactive refunds to the government where appropriate, the Court cannot say as a matter of law or fact that the proactive refund here negates relator's standing.

## II.      Pleading with Particularity

Defendants next argue that relator has not pled its claims with the requisite particularity required for fraud by Rule 9(b). Mot. at 7-14. Specifically, defendants argue that relator has not pled the element of materiality nor the time period of the alleged fraud with particularity.[5]

### A.      Materiality

The False Claims Act imposes liability on any person who, among other prohibited acts, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." 31 U.S.C. § 3729(a)(1)(A)-(B). The act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4). "Under any understanding of the concept, materiality looks

---

[5] Defendants also present an argument that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024) increases the burden on plaintiff to show particularity. *See*, *e.g.*, Reply at 8. The Court finds the guidance in *Loper Bright*—which concerns the weight given to an agency's interpretation of an ambiguous statute—unhelpful where defendants have not identified an ambiguous statute. Defendants clarify that they "d[o] not seek to invalidate or challenge any particular interpretation of CMS [Centers for Medicare and Medicaid Services] guidance" but the Court cannot discern what work defendants want *Loper Bright* to do in this case, even after asking directly at the hearing. *See* Reply at 8.

United States District Court
Northern District of California

to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (internal quotation marks, brackets, and citation omitted).

In this context, the focus of the materiality question should be whether defendants' allegedly fraudulent upcoding practices caused the government to pay claims at a rate it otherwise would not have paid for the same services had they been coded correctly. The Court finds that the allegations in relator's complaint meet this burden at the pleading stage, even under the heightened requirements for fraud. The complaint alleges that the billing codes determine what the government and private insurers reimburse and that the government only pays for medically necessary and reasonable services. TAC ¶¶ 44-46. The federal government considers upcoding to be fraud. *Id.* ¶ 203. The government and private insurers will not pay claims when they are aware that miscoding has occurred. *Id.* ¶¶ 204-205. Relator cites to persuasive case law in support of its position that defendants ignore in their reply. *See Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020) (finding upcoding "a simple and direct theory of fraud" with "plain and obvious materiality"); *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1085 (N.D. Cal. 2020) (finding the submission of false diagnosis codes material).

Defendants attempt to elide the materiality inquiry in two ways. First, they highlight how relator has not identified any physicians responsible for false documentation submitted to the government. Mot. at 12. But relator's fraud allegations do not directly concern physicians—they concern defendants and their practices, their knowledge, and their representations to the government in the forms of submitted claims. Moreover, the complaint also states that doctors "reasonably rely" on the guidance from defendants to ensure appropriate billing and, in the case of pushback, "naturally assume the SCP coder is correct." *Id.* ¶¶ 65-67, 94, 101-02. Second, defendants calculate the dollar amounts associated with the alleged overbilling in Dr. Kenley's audits at Chinese Hospital, presumably to communicate that not a lot of money is at issue. Mot. at 12; Reply at 9. This argument is unavailing—the materiality inquiry looks at the effect of the misstatement on the government's choice to pay, not on whether the fraud surpasses a certain amount-in-controversy

threshold.[6]

Read another way, defendants' materiality contentions appear to challenge not materiality but a more fundamental aspect of the alleged fraud: how defendants—not physicians—are responsible for the upcoding. Again, the Court finds that relator's allegations have met the heightened pleading requirements for fraud on this point. To upcode services to critical care, defendants allegedly trained coders to look for opportunities to label service as critical care, providing misleading guidance along the way to coders and providers. TAC ¶¶ 74-76. Defendants then used leading language to pressure providers into changing charts since providers assume defendants' coders are the experts. *Id.* ¶¶ 76-78, 94-102. And for non-critical care, relator alleges the coders upcode on their own initiative. *Id.* ¶ 185. Importantly, relator alleges that coders never asked physicians to downgrade the reported level of care, only to upgrade it. *Id.* ¶¶ 114, 173; *see also United States v. United Healthcare Ins. Co.*, 848 F.3d at 1175 (holding that "one-sided" reviews can violate the False Claims Act).

Defendants' arguments at the hearing that the deficiency notices were only about a lack of documented minutes in patient charts ignore that those notices also asked physicians to answer the question, "Did you provide critical care?" Compl. ¶ 109. While defendants may be able to prove at a later stage in this litigation that the notices were not intended to induce upcoding, at this stage the Court assumes relator's allegations are true. *See Usher*, 828 F.2d at 561. Assuming as such, the Court finds the claims pled with adequate particularity.

In short, defendants' attack on the basis of materiality fails.

**B.      Time Period**

In addition, defendants assert that relator has not pled the requisite time period of the fraud

---

[6] This line of argument also ignores the limited nature of Dr. Kenley's audit. Considering just the audit of non-critical care billing, where Dr. Kenley determined that some claims labeled Level 5 should have been labeled Level 3 or 4, defendants contend that the overbilling totaled "less than $600" for five claims. Dr. Kenley's audit lasted five days at only one of defendants' four hundred hospitals. If this level of overbilling was consistent through the year and across sites, the annual total could be close to $15,000,000 in overbilling for non-critical care ($500 * 5 days * 365/5 days * 400 sites = $14,600,000).

with sufficient particularity.  Mot. at 8-9, 13-14; Reply at 8-9.  The operative complaint, filed June 4, 2021, contains several allegations concerning the time period.  Relator began contracting with defendants in 2019 and provides examples of allegedly fraudulent billing from July 2019 through March 2020.  TAC ¶¶ 7, 118-199.  Relator alleges the critical care upcoding practices had been in place "[f]or at least several years before Relator began working at Chinese Hospital, and possibly since 2010," the year SCP Health started using its proprietary billing and coding software program.  *Id.* ¶ 73.  Relator alleges SCP Health removed "some of the more egregious leading query aspects" like the "chart deficiency" label in late 2020.  *Id.* ¶ 113.  However, the complaint alleges that SCP Health continues to use misleading definitions for critical care and that physicians still face pressure due to the 20% critical care quota expectation.  *Id.*

The Court concludes that relator has pled sufficient allegations regarding critical care billing to meet the two purposes of Rule 9(b): to prevent frivolous filings and to put the defendants on notice of the conduct at issue.  *United States v. United Healthcare Ins. Co.*, 848 F.3d at 1180.  The Court recognizes that relator's alleged start date is imprecise, but relators "need not allege a precise time frame" for the fraud.  *Id.* (internal quotation marks and citation omitted).  Relator has provided an outer limit (2010, when the defendants started using their billing and coding software) and has sufficiently alleged that certain practices continued through the filing of the complaint.  TAC ¶¶ 73, 113.  Relator notes in detail the practices Dr. Kenley encountered upon entering into contract with defendants in 2019, and defendants should be able to identify when it instituted those practices.

In *United States ex rel. Everest Principals, LLC v. Abbott Laboratories*, the court affirmed a discovery order that prescribed a wider timeframe for the alleged fraud than the relator's term of employment.  No. 3:20-CV-00286-W-MSB, 2024 WL 304082, at *5 (S.D. Cal. Jan. 26, 2024).  Since the relator had been trained to follow the allegedly fraud-creating policy when he was hired, the court found it reasonable to assume the policy had been in place for some time prior to the relator's hiring.  *Id.*  Here, Dr. Kenley encountered the issues he is raising regarding critical care billing upon his initial orientation in 2019.  TAC ¶¶ 80-81.  Given his experience and interactions in defendants' system, it is not unreasonable for him to assert that these issues existed "[f]or at least

several years before Relator began working" with defendants. *Id.* ¶ 73.[7]

Defendants do not distinguish between the critical care upcoding allegations and the non-critical care upcoding allegations in their time period arguments, but the Court finds a distinction between the two useful. For the non-critical care upcoding allegations, relator only discusses a sample of patient charts from a five-day period in November 2019. No other timing considerations are mentioned. While relator's time period allegations are slimmer in this regard, the Court finds them sufficient to allow limited discovery regarding alleged non-critical care upcoding for a time period equivalent to the course of relator's contracted employment with defendants. If such discovery provides a sufficient basis for broadening the non-critical care inquiry into a wider timeframe, relator may return to the Court to seek permission to do so.

In summary, the Court concludes that relator has sufficiently alleged a time period to give defendants notice of the federal False Claims Act count levied against them.

### III.    State Law Claims Outside of California

Lastly, defendants argue that relator has not sufficiently pled violations of state law fraud statutes outside of California because relator's examples all occur at one California hospital. Mot. at 14-19; Reply at 10-12. Relator succinctly counters that providing details regarding a nationwide scheme is sufficient to allege violations of state-level false claims statutes. Opp'n at 21.

In its complaint, relator alleges details establishing that the contested practices are nationwide in scope, although only makes specific reference to three states other than California. The complaint describes how SCP Health operates at 400 hospitals in 30 states and works through subsidiaries and affiliates in each of the qui tam states. TAC ¶¶ 20-21. As described more fully above, relator details SCP's centralized structure and standardized, nationwide practices. *Id.* ¶¶ 57-62, 79-82, 188. However, the complaint only directly references three other states where Dr. Kenley spoke with SCP executives responsible for facilities in Ohio, Illinois, and Florida, and those

---

[7] To the extent that defendants want to limit subsequent discovery, they can produce evidence during the discovery process that definitively shows when the contested practices started.

United States District Court
Northern District of California

executives confirmed that "chart deficiency" notices were commonly received by physicians in their facilities as well. *Id.* ¶¶ 81, 87.

The case law provides conflicting opinions as to whether the inference of a nationwide scheme supports state law causes of action. In *U.S. ex rel. Brown v. Celgene Corp.*, a pharmaceutical sales representative accused her former company of encouraging fraudulent claims through a nationwide practice of marketing drugs for off-label uses. No. CV 10-3165-GHK SSX, 2014 WL 3605896, at *1 (C.D. Cal. July 10, 2014). Since the complaint alleged "nationwide, systemic practices," the court did not dismiss the state law claims en masse. *Id.* at *10. However, the court did grant the defendant's motion to dismiss certain state law claims based on arguments specific to requirements contained those laws. *Id.* at *10-12. In *United States v. Supervalu, Inc.*, two pharmacists brought a qui tam action against a pharmacy chain in twenty-five states alleging the pharmacy submitted false claims when it charged the government its listed prices, not the lower prices it gave to consumers as a part of a competitive price-matching system. 218 F. Supp. 3d 767, 770 (C.D. Ill. 2016). The court found the allegations detailed a "uniform, nationwide and fraudulent scheme facilitated through a shared centralized . . . system." *Id.* at 772. As a result, the court determined that the complaint contained sufficient particularity to support claims under the False Claims Act and "related state laws," although the court provided no discussion specific to the state law claims. *Id.* at 776.

On the other hand, in *United States ex rel. Chin v. CVS Pharmacy, Inc.*, the court allowed a federal False Claims Act count to proceed but not counts under related state laws. No. CV 09-1293 PSG PJWX, 2017 WL 4174416, at *9 (C.D. Cal. Aug. 15, 2017). There, the relator had alleged four instances across three states of a pharmacy offering illegal inducements to transfer prescriptions. *Id.* at *7. The court found this sufficient to allege a nationwide scheme under the False Claims Act. *Id.* at *7-8. At the same time, the court granted defendant's motion to dismiss related state law claims because the relator could not "merely imply state FCA claims based on alleged federal FCA claims" and the relator had not pled specific facts about how false claims had been submitted to the states. *Id.* at *8-9. Separately, in *United States ex rel. Buth v. Walmart Inc.*, a district court determined that a pharmacist's allegations about fraudulent practices at her pharmacy

14

United States District Court
Northern District of California

1  were not sufficient to show that "management was aware of the . . . problem and failed to remedy

2  it" in other states.  No. 18-CV-840, 2019 WL 3802651, at *6-7 (E.D. Wis. Aug. 13, 2019).  As such,

3  the court allowed the False Claims Act to proceed but not related state laws from other states.  *Id.*

4  at *6-8; *see also United States v. Emergency Staffing Sols., Inc.*, No. 3:19-CV-1238-E, 2023 WL

5  2754347, at *7 (N.D. Tex. Mar. 31, 2023) ("While [the relator] may have alleged a nationwide

6  scheme of FCA violations . . . he has provided no reliable indicia leading to a strong inference that

7  Defendants submitted false claims in any state other than Oklahoma.")

8       Here, relator has plausibly alleged that the fraudulent scheme at issue here extends beyond

9  Dr. Kenley's experience at his hospital in California due to SCP Health's nationwide practices.  Like

10 in *Supervalu*, relator alleges "uniform, nationwide and fraudulent scheme facilitated through a

11 shared centralized . . . system."  *See* 218 F. Supp. 3d at 772.  Taken altogether, relator's allegations

12 create "reliable indicia that lead to a strong inference that claims were actually submitted" in

13 violation of the federal False Claims Act nationwide.  *See United States v. United Healthcare Ins.*

14 *Co.*, 848 F.3d at 1180.  Further, the complaint details that individual states administer the Medicaid

15 program and that Medicaid or other state-based funding accounts for approximately 40% of funding

16 for emergency department services.  TAC ¶¶ 3, 43.  Unlike in *Chin*, the Court finds that these

17 assertions are sufficient to form the basis of parallel state law claims.

18      Defendants make two further arguments against allowing the state law claims to move

19 forward, but the Court finds neither persuasive at this stage of the proceedings.  *See* Mot. at 18-19.

20 First, defendants argue that state laws often have procedural requirements and relator has failed to

21 allege satisfaction with those.  Defendants cite just one example from New Mexico.[8]  Without more

22 specifics, the Court declines to dismiss the state law claims on this basis.  Second, defendants argue

23 that this Court lacks supplemental jurisdiction over claims based on patient care in other states

24 because they are not based on the same transaction or occurrence as those claims arising under

25

26      [8] Defendants' cited case regarding the New Mexico Medicaid False Claims Act is
   distinguishable.  There, the Court had on record a report from the state agency that concluded the
27 relator "failed to provide substantial evidence to support a violation" of the state statute.  *United*
   *States v. United Behav. Health, Inc.*, No. 1:15-CV-01164-KWR-JHR, 2023 WL 1817380, at *12
28 (D.N.M. Feb. 8, 2023).  The Court has seen no such record here.

1   federal law.  *See* 31 U.S.C. § 3732(b).  Defendants miss the crux of relator's allegations, which is

2   that the fraudulent claims come from a centralized, standardized billing structure under SCP Health.

3   Since relator challenges defendants' consistent practice and not payment issues isolated to one or

4   two sites, the Court properly exercises supplemental jurisdiction.

5        In conclusion, the Court denies defendant SCP Health's motion to dismiss the state law

6   claims against it.  However, the non-California state law claims are dismissed as to defendant

7   California Emergency Associates, an SCP Health subsidiary or affiliate alleged to be "a California

8   medical corporation doing business in California and controlled by SCP."  TAC ¶ 23.

9

10  **IV.    Discovery Dispute**

11        Given the age of this case, the Court allowed some discovery to proceed pending the motion

12  to dismiss.  Dkt. No. 90 (Transcript of January 17, 2025 Case Management Conference).  On April

13  2, 2025, the parties presented a dispute about the scope of that discovery.  The Court considers this

14  scope dispute moot now that it has ruled on the motion to dismiss.  The parties also dispute whether

15  their stipulated protective order, approved by the Court, is a "qualified protective order" that allows

16  sharing of personal health information under the Health Insurance Portability and Accountability

17  Act (HIPAA).  HIPAA regulations allow discovery of protected health information when there is a

18  protective order in place that prohibits use or disclosure outside of the litigation and requires the

19  return or destruction of the information at the end of the litigation.  45 C.F.R. § 164.512(e)(1)(ii),

20  (iv)-(v). In this case, the stipulated protective order meets both conditions.  Dkt. No. 96 ¶¶ 7.1, 13.

21  Defendants cannot withhold discovery on this basis.

22

23                          **CONCLUSION**

24        For the foregoing reasons and for good cause shown, the Court hereby DISMISSES non-

25  California state law causes of action against defendant California Emergency Associates without

26  leave to amend.  Defendants' motion is DENIED in all other respects.

27        The Court orders the parties to appear for a further case management conference to discuss

28  the next steps in this litigation on May 30, 2025.  By no later than May 23, 2025, the parties must

United States District Court
Northern District of California

16

submit a joint statement to the Court in accordance with the standing order for all judges of the Northern District of California.

     **IT IS SO ORDERED**.

Dated: May 9, 2025

                                                 _____
                                                SUSAN ILLSTON
                                                United States District Judge

United States District Court
Northern District of California