UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENLEY EMERGENCY MEDICINE, et al., | Case No.  20-cv-03274-SI |
| Plaintiffs, | **ORDER RE: DEFENDANTS' MOTION FOR BIFURCATION AND DISCOVERY DISPUTES** |
| v. | |
| THE SCHUMACHER GROUP OF LOUISIANA INC., et al., | Re: Dkt. Nos. 166, 167, 171, 175 |
| Defendants. | |

Before the Court is defendants' motion to bifurcate the remainder of discovery and trial, and for a protective order establishing the end date for the relevant time period for discovery as October 1, 2020.  Dkt. No. 166.  In addition, the Court addresses three discovery disputes filed by letter motion.  Dkt. Nos. 167, 171, 175.  The Court held a hearing on February 13, 2026.  For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART defendants' formal motion (Dkt. No. 166).  The Court GRANTS defendants' letter brief (Dkt. No. 171), GRANTS relator's first letter brief (Dkt. No. 167), and DENIES relator's second letter brief (Dkt. No. 175).

**BACKGROUND**

The background section provided below is drawn largely from this Court's order granting in part and denying in part defendants' motion to dismiss.  Dkt. No. 105 at 1-5.

**I.    Factual Background**

Dr. Eric Kenley is the sole owner of qui tam plaintiff and relator, Kenley Emergency Medicine Corporation. Dkt. No. 241 (Third Amended Complaint ("TAC")) ¶ 16.  Dr. Kenley is an

attending emergency physician and was the medical director at Chinese Hospital in San Francisco, California. *Id*. ¶ 17. Dr. Kenley's corporation contracted with defendant California Emergency Associates, an affiliate of defendant The Schumacher Group of Louisiana, Inc. (d/b/a SCP Health), to provide emergency medical services at the hospital. *Id*. Relator alleges that defendants SCP Health and its affiliates instituted two systematic fraudulent practices in their coding and billing of emergency medical services. *Id*. ¶ 72.

First, defendants allegedly improperly pressured providers into charting for critical care services when the threshold for such services had not been met. SCP Health trained its coders, who work out of SCP Health's corporate headquarters, to look in patient charts for opportunities to bill services as critical care, even if the providers had not initially coded their services as critical care. *Id*. ¶¶ 74- 75, 188. The coders then "routinely bombard physicians with leading queries and misleading information" contained in "chart deficiency notices" that label their original charts as "deficient" or "incomplete." *Id*. ¶¶ 75-77, 90-94, 107-113. Relator's own investigation of critical care "upcoding" practices at its hospital found in an audit sample that 30% of charts upgraded to a critical care code after a deficiency notice did not contain a necessary critical care statement from the physician, which SCP Health "knows, deliberately ignores, or recklessly disregards." *Id*. ¶¶ 116-117. Relator details examples of inappropriate billing for twenty-seven patients with four common conditions improperly upgraded to critical care: sepsis, troponin elevations or possible NSTEMI [a form of heart attack], anemia, and possible stroke. *Id*. ¶¶ 118-183.

Second, defendants allegedly deliberately and inappropriately "upcode" non-critical care to a higher, more profitable level of non-critical care. *Id*. ¶ 184. Relator audited twenty random charts from five days in November 2019 coded at the highest level of non-critical care (Level 5) and determined "conservatively" that nine of the twenty should have been billed at either Level 4 or Level 3. *Id*. ¶ 187. In the TAC, relator also provides five representative examples of patients whose care was inappropriately billed at Level 5. *Id*. ¶¶ 189-199

While relator's experience is limited to one California hospital, relator alleges the practices at issue were employed by SCP Health nationwide. Relator alleges that SCP Health operates through a network of subsidiaries and affiliates but these companies "function as a single unified

entity with SCP setting the policies, providing the training for staff, and providing all of the administrative services, including all coding and billing services at issue" in this case. *Id.* ¶¶ 21-22. Since SCP Health's coders follow a standardized process, relator alleges its experience at its hospital "is likely representative of other SCP sites." *Id.* ¶ 188.

The patient examples provided by relator refer to care provided in 2019 and 2020, when relator began contracting with SCP Health. *Id.* ¶ 7. But relator alleges the upcoding has taken place "[f]or at least several years before Relator began working at Chinese Hospital, and possibly since 2010," when SCP Health began using its proprietary billing and coding platform. *Id.* ¶ 73. After Dr. Kenley continued to raise concerns about the upcoding, SCP Health made changes in late 2020 "that obscured the more conspicuous aspects of the fraud," but relator alleges upcoding remains ongoing. *Id.* ¶ 88.

Relator's operative complaint brought twenty-two causes of action, under the False Claims Act (Count I), the California false claims act (Count II), California and Illinois insurance fraud prevention laws (Counts III and VIII), and the false claims acts of seventeen other states (Counts IV-VII, IX-XXII). *Id.* ¶¶ 208-377. Relator seeks injunctive relief that forces defendants to cease and desist from the alleged fraudulent practices, maximum statutory damages, and attorney's fees. *Id.* ¶¶ 83-85.

## II.   Procedural Background

Relator initially filed its qui tam complaint under seal against defendants on May 14, 2020. Dkt. No. 1. On April 5, 2024, after the government was granted multiple extensions of time to decide whether to intervene, the United States and the various plaintiff states declined intervention in the litigation. Dkt. No. 39. The complaint was unsealed shortly after. Dkt. No. 40. The California Insurance Commissioner declined intervention on April 11, 2024. Dkt. No. 42.

The case was transferred to the Court of the undersigned judge on July 26, 2024. Dkt. No. 56. Defendants' filed a motion to dismiss relator's TAC on December 13, 2024. Dkt. No. 74. On May 9, 2025, after an unusually elongated briefing schedule, the Court dismissed with prejudice non-California state law claims against California-based defendant California Emergency

3

Associates, but denied defendants' motion to dismiss in all other respects. Dkt. No. 105. On June 13, 2025, defendants answered the TAC. Dkt. No. 111.

Since then, this Court has held four case management conferences. Dkt. Nos. 113, 138, 154, 157. Parties have required the Court's intervention for several previous discovery disputes. *See* Dkt. Nos. 137, 150, 154, 157. At the most recent further case management conference on November 25, 2025, parties provided an update on discovery issues and confirmed that they agreed to an extension of the substantial completion deadline to December 10, 2025. Dkt. No. 157. On January 13, 2026, the Court granted in part parties' stipulation to extend deadlines, and the non-expert discovery cutoff is now April 24, 2026. Dkt. No. 168. Parties participated in a settlement conference before Magistrate Judge Laurel Beeler on February 9, 2026. Dkt. No. 185.

Before the Court are several competing discovery letters and motions filed by relator and defendants. Dkt. Nos. 165, 166, 167, 169, 170, 171, 173, 174, 175, 176, 177.

On January 9, 2026, defendants filed a formal motion, which seeks from the Court (1) bifurcation of liability and damages for remaining discovery and phases of trial, and (2) a protective order establishing October 1, 2020 as the end date for the relevant discovery period. Dkt. No. 166 at 4.[1] Relator filed its opposition on January 23, 2026. Dkt. No. 177. On January 27, 2026, defendants replied. Dkt. No. 180.

On January 12, 2026, relator filed an individual letter brief requesting an order compelling defendants to participate in an Electronically Stored Information ("ESI") search validation and quality control process. Dkt. No. 167. Defendants filed a letter in response on January 14, 2026. Dkt. No. 169.

On January 20, 2026, defendants filed an individual letter brief in support of a protective order that precludes discovery of additional private protected health information ("PHI") outside of

---

[1] In connection with defendants' formal motion, defendants filed an administrative motion to consider whether relator's material should be sealed. Dkt. No. 165. Pursuant to Civil Local Rule 79-5 (f), relator filed a response in support of defendants' administrative motion to seal on January 16, 2026. Dkt. No. 170. Then, in connection with relator's opposition to defendants' formal motion, relator filed an administrative motion to consider whether defendants' material should be sealed. Dkt. No. 176. Pursuant to Civil Local Rule 79-5 (f), defendants filed a response in support of relator's administrative motion to seal on January 30, 2026. Dkt. No. 183. These sealing motions are resolved in separate orders.

United States District Court
Northern District of California

Chinese Hospital, where Dr. Kenley worked and conducted an internal audit, pending the resolution of whether any violations of the False Claims Act or the like occurred at the Chinese Hospital. Dkt. No. 171 at 1. Relator filed a letter in response on January 23, 2026. Dkt. No. 173.

That same day, relator filed an individual letter brief seeking an order compelling defendants to immediately produce documents and communications regarding deficiency queries in response to relator's Second RFP No. 10. Dkt. No. 175.[2] Defendants filed a letter response on January 27, 2026. Dkt. No. 179.

The Court held a hearing on these matters on March 3, 2026.[3]

**LEGAL STANDARD**

**I.      Bifurcation**

Pursuant to Federal Rule of Civil Procedure 42(b), the district court may order separate trials of one or more issues or claims "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P 42(b). "It is implicit that the court also ha[s] power to limit discovery to the segregated issues." *Ellingson Timber Co. v. Great N. Ry. Co.*, 424 F.2d 497,499 (9th Cir. 1970). The court has broad discretion in deciding whether to bifurcate. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). Courts consider several factors in determining whether bifurcation is appropriate, including whether the issues are clearly separable, and whether bifurcation would increase convenience and judicial economy, reduce the risk of jury confusion, and avoid prejudice to the parties. *See* Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial § 16:160.4 (2010); *Hirst v. Gertzen*, 676 F.2d 1252, 1261 (9th Cir. 1982). The party

---

[2] In connection with relator's second letter motion, relator filed an administrative motion to consider whether defendants' material should be sealed. Dkt. No. 174. Pursuant to Civil Local Rule 79-5 (f), defendants filed a response in support of relator's administrative motion to seal on January 30, 2026. Dkt. No. 183. This sealing motion is resolved separately.

[3] The hearing in this matter was originally scheduled for February 13, 2026. However, on February 9, 2026, defendants filed a letter informing the Court of defendants' intent to file a motion to disqualify certain of relator's counsel and defendants' request to supplement the record on defendants' formal motion for bifurcation and a protective order with those filings. Dkt. No. 184. Those issues are resolved in a separate order.

United States District Court
Northern District of California

requesting bifurcation has the burden to prove bifurcation is warranted in that particular case. *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 102 (N.D. Cal. 1992). In the Ninth Circuit, "[b]ifurcation ... is the exception rather than the rule of normal trial procedure." *Clark v. I.R.S.*, 772 F.Supp.2d 1265, 1269 (D. Haw. 2009) (*citing Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004)).

## II.    Protective Order

Pursuant to Federal Rule of Civil Procedure 26(c)(1), a party may move for a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The moving party has the burden of establishing the "good cause" standard required by Rule 26(c). *Id.*; *Phillips ex rel. Est. of Byrd v. Gen. Motors Corp.*, 307 F.3d. 1206, 1210-1211 (9th Cir. 2002). "[B]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003).

## III.    Discovery Disputes

"'[A] district court has wide discretion in controlling discovery.'" *Jeff D. v. Otter*, 643 F.3d 278, 289 (9th Cir. 2011) (quoting *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir.1988)). In general, parties may obtain discovery regarding any unprivileged matter that is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Factors to consider include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* An item need not be admissible in evidence to be discoverable. *Id.*

A motion to compel discovery is appropriate when a party refuses to engage in or produce discovery. *See* Fed. R. Civ. P. 37(a). The movant must certify that he or she has in good faith conferred or attempted to confer with the party failing to make discovery in an effort to secure

United States District Court
Northern District of California

6

information or material without court action.  *See* Fed. R. Civ. P. 37(a)(1).

**DISCUSSION**

**I.      Defendants' Motions**

      **A.      Bifurcation of Liability and Damages**

In defendants' formal motion, defendants argue that bifurcation of liability and damages for the remainder of discovery and phases of trial "can prevent the potential waste of resources on damages discovery, damages experts, and a trial on damages if liability cannot be established." Mot. at 13.  Defendants contend that "bifurcation will serve judicial economy by allowing the parties and the Court to conserve resources if Relator is unable to establish that Defendants did not engage in systematic upcoding." *Id.* at 14.  Relator argues that defendants' "generalized claims of efficiency" should be rejected because unspecific arguments about judicial economy could apply to almost every case.  Opp'n at 12-13.

Defendants' briefing seems to suggest that the complexity of the issues, including possible claims spanning from 2010 to present and allegations of upcoding at 400 facilities nationwide, warrants bifurcation.  *See* TAC ¶¶ 20-21, 57-62, 73, 113-14, 188.  Defendants point to a comparable federal and state law False Claims Act case bifurcating trial and discovery where the court limited the first phase to the issues of falsity, materiality, and scienter, and "five examples of 'false claims.'" *See United States v. J-M Mfg. Co. Inc.*, 2011 WL 13054147, at *1 (C.D. Cal. Dec. 7, 2011).  The *J-M Mfg.* court explained that if plaintiffs were successful in the first phase of trial, there would be a second phase of trial where the number of false claims and the damages resulting from the false claims would be determined.  *Id.*

In its opposition, relator relies on four cases that stand for the general proposition that to prove bifurcation is warranted, a moving party must do more than merely assert it would be efficient to separate the issues of liability and damages.  *See Jones v. Nat'l R.R. Passenger Corp.*, 2018 WL 6606247, at * 5 (N.D. Cal. Dec. 17, 2018) (denying bifurcation in a personal injury case brought under federal and state anti-disability discrimination statutes); *Canchola v. Allstate Ins. Co.,* 2025 WL 2373271, at *2 (C.D. Cal. July 3, 2025) (denying bifurcation in a class action for violation of

California Labor Code § 2802); *GEM Acquistionco, LLC v. Sorenson Grp. Holdings, LLC*, 2010 WL 1729400, at *3 (N.D. Cal. Apr. 27, 2010) (denying bifurcation in a breach of contract case where party failed to show issues were "so complex as to warrant bifurcation"); *Putterbaugh v. Oorah, Inc.* 2023 WL 4317358, at *2 (C.D. Cal. June 1, 2023) (denying bifurcation in a false advertising and unfair competition case and noting "this is not a complex case").

While not finding any of relator's cited authority to be directly on point, the Court agrees with relator that defendants must do more than generally assert that bifurcation would make proceedings more efficient to merit bifurcation. Defendants are correct that bifurcation would increase convenience and judicial economy if relator cannot prove defendants' liability during the liability phase of discovery and trial. But if the liability phase does establish defendants' liability, bifurcation will make proceedings less efficient. Therefore, the court cannot conclude that bifurcation of liability and damages would be likely to increase convenience and judicial economy, reduce the risk of jury confusion, and avoid prejudice to the parties. *See* Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial § 16:160.4 (2010); *Hirst v. Gertzen*, 676 F.2d 1252, 1261 (9th Cir. 1982).[4]

Most importantly, defendants do not argue that the issues of liability and damages are clearly separable, and the Court finds they are not. *See* Opp'n at 14. The Court agrees with relator that the issues of liability and damages are wholly intertwined because: "There exists little daylight between liability (establishing the ***falsity*** of a claim) and damages (counting the ***number*** of false claims, determining the overpayment, and levying a civil penalty) – both require discovery on, and analysis of, the claims submitted for payment and the underlying medical records that Defendants have used to code those claims." *Id.* Bifurcation is appropriate where evidence of liability does not "overlap in any meaningful way" with evidence of damages. *C.f. Aguirre v. California*, 2018 WL 1948702

---

[4] With this said, the Court is also unpersuaded by relator's argument that defendants' motion would necessarily make this case *less* efficient because defendants bring this motion too late. Opp'n at 13. The non-expert discovery cut off has been extended until April 24, 2026, and the expert discovery cut off is not until June 30, 2026. Dkt. No. 168. Some form of bifurcation could still promote efficient discovery.

*United States District Court*
*Northern District of California*

(N.D. Cal. Apr. 25, 2018) (citing *Quintanilla v. City of Downey*, 84 F.3d 353, 356 (9th Cir. 1996)). Here, the issues of liability and damages are not clearly separable, so bifurcation is inappropriate.

Accordingly, the Court DENIES defendants' motion to bifurcate liability and damages for the remainder of discovery and to phase trial accordingly.

### B.    Bifurcation as to the Chinese Hospital

In defendants' reply brief and at the hearing, defendants argue that rather than bifurcate discovery and trial into liability and damages phases, the Court should order that remaining discovery should focus only on the Chinese Hospital, where Dr. Kenley worked and conducted his internal audit.  Reply at 7, 11.[5]  To the extent sampling is to take place during the liability phase, defendants suggest it should be limited to the Chinese Hospital, rather than nationwide sampling. *Id.* at 7, 9.  Defendants argue that the production of nationwide PHI for sampling and the prospect of numerous depositions of medical providers nationwide would be unduly burdensome and disproportionate to relator's allegations that primarily focus on the Chinese Hospital.  Reply at 9.

Defendants cite *United States ex rel. Conroy v. Select Med. Corp.*, 307 F. Supp. 3d 896 (S.D. Ind. 2018) as "right on point."  Reply at 9-10.  In *Select Medical*, the Court rejected a relator's request to conduct discovery through nationwide sampling into patient files and medical records at defendant's 100+ facilities.  307 F. Supp. at 906-07.   The Court finds *Select Medical* to be instructive and agrees with defendants that limiting discovery to the Chinese Hospital at this time will likely make proceedings more efficient and conserve parties' resources.

At the hearing, relator argued that bifurcating discovery of liability at the Chinese Hospital from nationwide hospitals would be inefficient and require to relator to rework their discovery efforts.  The Court is not persuaded.  The Court finds nationwide discovery to be disproportionate to the needs of the case at this point, particularly since relator's specific allegations and exemplar upcoding cases took place only at the Chinese Hospital.

---

[5] Prior to filing defendants' reply, defendants also suggested the Court limit discovery of PHI to the Chinese Hospital in defendants' discovery letter filed on January 20, 2026, resolved by the Court below.  Dkt. No. 171.

The Court therefore GRANTS defendants' motion as to bifurcating discovery at the Chinese Hospital from discovery at the other hospitals, pending the resolution of whether any violations of the False Claims Act occurred at the Chinese Hospital.

### C.    PHI Outside of Chinese Hospital

Defendants also filed a letter discovery brief arguing for a protective order that precludes discovery of additional PHI outside of Chinese Hospital pending the resolution of whether any violations of the False Claims Act occurred at the Chinese Hospital. Dkt. No. 171 at 1.[6] Defendants argue that an additional protective order is necessary largely because "HIPAA should matter here." *Id.* at 2. Defendants also re-raise arguments from their formal bifurcation motion regarding evidence they contend disproves relator's claims of systematic upcoding. Dkt. No. 171 at 1-2.

In response, relator contends that an additional protective order is unnecessary because "PHI is already protected by the Protective Order entered in this case, Dkt. [No.] 96, and Defendants have otherwise not established sufficient cause for the issuance of a protective order under Rule 26(c)." Dkt. No. 173 at 1. Relator also raises the concern that if defendants were to prevail both on bifurcating discovery and trial as to liability and damages, and on bifurcating discovery and trial on liability between Chinese Hospital and all other institutions, relator would essentially need to prevail on six different stages of proceedings. Dkt. No. 173. Having denied defendants' bifurcation motion as to liability and damages phases, the Court finds relator's efficiency concerns largely resolved.

As discussed above, the Court GRANTS defendants' letter brief and precludes discovery additional PHI outside of the Chinese Hospital pending the resolution of whether any violations of the False Claims Act occurred at the Chinese Hospital.

### D.    Protective Order Establishing October 1, 2020 Discovery End Date

In defendants' formal motion, defendants also contend that the relevant end date for the

---

[6] Relator states that defendants did not meet and confer with relator prior to filing their letter. Dkt. No. 173 at 1. The Court admonishes parties that they must comply with this Court's Standing Order.

remainder of discovery should be October 1, 2020 to "help assure that discovery going forward remains proportionate to the needs of the case." Mot. at 16. At the hearing, defendants argued that the end date should instead be May 14, 2020, the original filing date. Relator argues that discovery should not be limited temporally because defendants have neither met their burden to establish good cause under Rule 26(c) nor adhered to this Court's prior guidance in its motion to dismiss order. Opp'n at 8.

In this Court's May 9, 2025 order granting in part and denying in part defendants' motion to dismiss, the Court instructed that to establish temporal limitations on discovery, defendants "can produce evidence during the discovery process that definitively shows when the contested practices started." Dkt. No. 105 ("MTD Order") at 13 n. 7. While the Court's order specifically contemplated disputes as to the appropriate *beginning* of the discovery period the same guidance applies to establishing the appropriate *end* of the discovery period.

Defendants' suggestion that October 1, 2020 is the most reasonable end date for discovery is based primarily on its contention that defendants remedied their query practices by that date. Mot. at 9. Relator acknowledges SCP Health removed "some of the more egregious leading query aspects" like the "chart deficiency" label in late 2020. TAC. ¶ 113. Even so, the TAC alleges that SCP Health continues to use misleading definitions for critical care and that physicians still face pressure due to the 20% critical care quota expectation. *Id.*

According to defendants' motion, "it is undisputed that since *no later than October 1, 2020*, the query process ceased using the terms 'deficient' and 'deficiency,' among other changes." Mot. at 9. The Court finds the timeframe of defendants' contested query practices are still in dispute. As relator highlights in its opposition, defendants provide no evidence showing which changes were actually implemented in October 2020 or if those changes remedied the alleged upcoding, let alone any *definitive* evidence. *See* Opp'n at 1-5.[7] Defendants instead state that they "expect to show at

---

[7] Defendants suggest two exhibits supply evidence that the query process was remedied by October 1, 2020. Dkt. No. 166-1, Schoenberg Decl., Exs. C &D. However, the Court is unpersuaded either establishes October 1, 2020 as the definitive date defendants' disputed query practices stopped.

United States District Court
Northern District of California

any trial that when a Chief Medical Officer, with the participation of General Counsel, informed Dr. Kenley about the removal of the words 'deficient' and 'deficiency' from the query process and other changes, Dr. Kenley expressed appreciation, stating the changes went 'above and beyond,' and were 'moving forward fantastically.'" *Id.*

Relying heavily on *United States ex rel. Conroy v. Select Med. Corp.*, 307 F. Supp. 3d 896 (S.D. Ind. 2018), defendants suggest that discovery should focus only on plausible allegations relator made with "sufficient particularity." Mot. at 16. The Court is not persuaded that this case – defendants' sole authority – supports a May 14, 2020 or October 1, 2020 discovery cut off. Indeed, the *Select Med.* court explained that the date plaintiffs filed their sealed complaint (April 18, 2012) would be an inappropriate cut off "because the nature of the allegations is that the scheme was ongoing." *Id.* at 906. Here, too, the complaint alleges an ongoing scheme, and defendants have snot provided definitive evidence to show that alleged scheme ended on May 14, 2020.

In sum, the Court DENIES defendants' motion for a protective order establishing October 1, 2020 as the discovery end date. With this said, in order to ensure discovery remains proportional to the needs of the case, the Court agrees with defendants that some temporal limits on discovery are appropriate. At the hearing, defendants explained the burdens they would face if discovery were to extend after August 3, 2022. Therefore, the Court establishes **August 3, 2022** as the relevant discovery cut-off date.

## II.    Relator's Motions

### A.    Motion to Compel ESI Search Validation

On January 12, 2026 relator filed a discovery letter brief requesting an order compelling defendants to participate in an Electronically Stored Information ("ESI") search validation and quality control process. Dkt. No. 167.[8] Relator states that this request is consistent with the parties'

---

[8] As defendants point out, relator should have attempted to submit a "concise *joint* statement of 5 pages or less" before submitting an individual statement. *See* Judge Illston's Standing Order ¶ 3. In the interest of efficiency and because parties met and conferred as to the issues raised in relator's brief, the Court considers relator's brief on the merits but again admonishes parties that they must comply with the Standing Order going forward.

United States District Court
Northern District of California

United States District Court
Northern District of California

stipulated ESI Protocol Sections 5(e) and (h).  *See* Dkt. No. 121.

ESI Protocol Section 5(e) governs "search terms" and states in relevant part: "The parties shall meet and confer regarding the proposed search terms within a reasonable period of time after receipt of such terms and regarding appropriate testing, sampling or quality control measures to be conducted to evaluate the sufficiency of proposed search terms." *Id.*  ESI Protocol Section 5(h) governs "validation" and states in full: "The Parties will meet and confer regarding appropriate measures for validating the results of any advanced search methodologies applied to identify potentially responsive documents, including statistical sampling of the null set." *Id.*

Relator states that defendants have produced 28,597 documents but the search results are "highly unusual." *Id.* at 1-2.  Apparent deficiencies relator identifies include a low number of documents, large numbers of duplicates, missing emails, missing custodians, and missing time periods. *Id.* at 1.  Relator requests that defendants engage in a validation method that involves sampling the null set to ascertain whether the search terms at issue inadvertently excluded relevant information. *Id.* at 2.  Parties met and conferred on January 9, 2025, and defendants stated that they did not agree to perform any validation or quality assurance methods on the null set. *Id.*  Defendants also stated in a January 12, 2026 email that they used sampling to validate removal of non-responsive material from documents that hit on search terms. *Id.*  Relator requests the results of these findings be provided as well. *Id.*

Defendants' response, filed January 14, 2026, argues that relator's letter brief runs afoul of the ESI protocol and the parties' representation to the Court in their November 14, 2025 joint case management statement that "The parties have come to an agreement on search terms with respect to both Defendants' documents and Relator's documents." Dkt. No. 169 at 1; *see* Dkt. No. 156 at 1. Defendants argue that under Section 5(e) of the ESI protocol, the parties only agreed to address *proposed* search terms "within a reasonable period of time after receipt of such terms." Dkt. No. 169 at 1.  Defendants argue that relator's request for validation should have occurred promptly after defendants shared proposed search terms and is too late now. *Id.* at 2.[9]

---

[9] Defendants also argue that Section 5(h) of the ESI protocol requiring "validation," which applies only to "advanced search technologies," does not apply here because defendants used

13

United States District Court
Northern District of California

The Court is not persuaded by defendants' argument. Defendants ignore the second half of ESI Protocol Section 5(e), which includes no promptness requirement: "The parties shall meet and confer regarding the proposed search terms within a reasonable period of time after receipt of such terms **and regarding appropriate testing, sampling or quality control measures to be conducted to evaluate the sufficiency of proposed search terms."** Dkt. No. 121. Section 5(e) plainly contemplates that some kind of testing, sampling, or quality control measures will be conducted and that parties will meet and confer to determine the "appropriate" measures. Furthermore, as relator acknowledges, e-discovery is an "iterative and cooperative process" that does not end when parties agree on a set of search terms. *See Matsko v. Tesla, Inc.* 2025 WL 1144827, at *4 (N.D. Cal. Apr. 18, 2025).[10]

Therefore, the Court GRANTS relator's motion to compel defendants to participate in ESI search validation and quality control processes and ORDERS the parties to meet and confer regarding sampling the null set.

### B.      Motion to Compel Production Responsive to Second RFP No. 10

On January 23, 2026, relator filed another letter brief requesting an order compelling defendants to immediately produce documents and communications regarding "Deficiency Queries and Communications" in response to relator's Second Request for Production ("RFP") No. 10. Dkt. No. 175 at 1. Relator states that defendants have only produced 465 communications from mySCP and Salesforce for the timeframe of 2010 to 2020.[11]  *Id.* at 2. Moreover, relator states that the fact

---

manual reviews, rather than predictive AI or coding.  *Id.*  Dkt. No. 169 at 1-2.  As to Section 5(h), defendants cite no authority to support their definition of "advanced search technologies."

[10] Defendants suggest that the cases relator cites are inapposite primarily because they concerned situations where, unlike here, parties disputed the terms to include in an ESI Protocol, not the meaning of agreed upon terms.  Dkt. 169 at 1-2.  Even so, the Court does not find that granting relator's motion here would impose methodologies contrary to the parties' agreement. *Id.* Rather, the Court reads the text of the ESI Protocol to contemplate reasonable validation measures, such as sampling the null set as relator requests.

[11] Defendants request documents and communications in response to Second RFP No. 10 from three sources: (1) the Electronic Provider Feedback System ("EPF"), relator's proprietary software system used to send deficiency notices, (2) Salesforce, and (3) MySCP.

that production ends in September 2020 demonstrates that defendants "have unilaterally cut off discovery to comport with the temporal limitations they seek, Dkt. [No.] 166, but which have not been authorized by the Court." *Id.*

Defendants first raise the threshold procedural issue that relator failed to comply with Judge Illston's Standing Order and with the Federal Rules of Civil Procedure. Dkt. No. 179. Defendants state that relator did not attempt to submit a joint discovery letter, nor did it meet and confer with defendants following the production of responsive communications at issue in this letter. *Id.* Prior to filing a motion to compel discovery, a movant must certify that he or she has in good faith conferred or attempted to confer with the party failing to make discovery in an effort to secure information or material without court action. Fed. R. Civ. P. 37(a)(1). Relator's motion to compel production is therefore DENIED without prejudice.[12]

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby the Court GRANTS IN PART and DENIES IN PART defendants' formal motion (Dkt. No. 166). The Court GRANTS defendants' letter brief (Dkt. No. 171), GRANTS relator's first letter brief (Dkt. No. 167), and DENIES relator's second letter brief (Dkt. No. 175).

**IT IS SO ORDERED**.

Dated: March 17, 2026

SUSAN ILLSTON
United States District Judge

---

[12] In response, defendants also argue that they have undertaken massive discovery efforts including review of hundreds of thousands of documents, reviewed hits for "critical care," and produced responsive communications. Dkt. No. 179 at 2. Specifically, defendants argue that they have produced more than 397 communications from Salesforce, 1,300 messages from mySCP Complete, and 95 communications from mySCP Connect. *Id.* However, defendants do not address relator's allegation that defendants have unilaterally cut off discovery in September 2020 to comport with the temporal limitations they seek in their formal motion. To the extent defendants have done so, the Court finds that to be inappropriate.

United States District Court
Northern District of California

15